So we recognize you. Good morning again, or good morning today. Thank you. Thank you. Good morning to you. May it please the court. My name is Lucian Gilliam and I represent David Singer in a lawsuit for defamation, invasion, privacy against Jim Harris and disability discrimination against the Arkansas Treasurer's Office. This case primarily revolves around an email that was written on April 6, 2015, by Jim Harris, who was Chief of Staff for the Treasurer. It contains considerable false and defamatory material, including allegations of mental health and then the dissemination of information in that email within the Treasurer's Office prior to Singer's termination in late April and dissemination to the press after Singer's termination. Also in late April. I want to address the defamation issues in the case first. Now those can be divided into two areas for this argument. One is the grant of summary judgment for the original writing of the email and the dissemination of it within the Treasurer's Office by Jim Harris, where summary judgment was granted on statutory immunity grounds, which is akin to qualified immunity. In Arkansas law, and then there are the issues at trial where a bad jury instruction was given instruction number 13 that inappropriately defined whether or not a jury could define publication. The issue that I want to address first is the issue of the jury instruction at trial. The standard of review there is abuse of discretion, but interpretations of state law, they're funneled into those instructions are reviewed de novo. And the issue is whether or not the instructions as a whole fairly present the law at issue. Now under J.C. Carlisle Corporation v. Farmers Liquid Fertilizer 346 F. Second 91, a single jury instruction that substantially prejudices the rights of a party can be a basis for reversal. And the kinds of things that bring about that sort of prejudice are instructions that could mislead a jury and have a probable impact on the jury's verdict, which is the J.C. Carlisle case. It is also that kind of error is also reached where a jury is instructed in peremptory terms on what facts it will find. That case would be Bowles v. Goebel 151 F. Second 671. And finally, if a charge is not supported by the evidence, you could create error that way as well. And that's Byrne v. Evans 349 F. Second 282. Those are all Eighth Circuit cases. And in this case, all three kinds of errors were created by instruction number 13. Now instruction 13 read that if the evidence, it was kind of appended to the issue of publication in the defamation instruction. It read, if the evidence shows that Maureen Glicevich, who was a Channel 7 reporter, possessed Exhibit 1, which is the e-mail, before Defendant Jim Harris delivered it to her, then you must find that Harris did not publish it to her. And the reason for that was that the defendant in the case was attempting to argue that the e-mail had been delivered to Maureen Glicevich in a box full of documents in response to a Freedom of Information Act request in the morning before Jim Harris came to her later on in the day, had a red folder in his hand and said, if you want the real story, make a request for this. And she forwarded that and got the e-mail. Now, the reason that instruction is problematic is, first of all, it appears to say that if you republish defamatory material, that you are not liable for doing it. And Arkansas law is clearly, without question, that if you republish defamatory material, that you are liable, just as though you were the person who originally made the publication, who originally made the defamatory statements. That's the Nance v. Flaw case, I'm not sure how you pronounce it, from the Arkansas Supreme Court. And it's also the Dun & Bradstreet case, which is cited in my brief and which was overruled on other grounds. Have you ever found a case where republication to the same recipient who had received that information from a prior source resulted in liability? Um... I couldn't find one. I don't think those were the exact facts of either Nance or Dun & Bradstreet. Now, what I can say is that Section 577A of the Restatement of Courts says that each of several communications to a third person by the same defamer is a separate publication. And in addition, 578, which is basically was adopted, not explicitly, but effectively adopted in the Nance v. Flaw case, says that one who repeats or otherwise republishes defamatory matter is subject to liability as if he'd originally published it. And the other thing I would say is that AMI 412, the Model Instruction on Publication, says that publication is where you go and give defamatory material to a third party, someone not the subject of the statement. And it doesn't have anything where it says except if you've already delivered it to this person earlier. So I think that it's pretty clear that if you republish defamatory material under Arkansas law, you're liable for defamation as though you originally published it. And that's a pretty close quotation of the Nance case. The other reasons... Well, let me... Yes, sir. Can I just clarify that the kernel of defamation here that this all revolves around is this email from Harris to Brady? Is that correct? Yes, sir. And so that email was in the FOIA materials that was released by the Secretary of State's office to Channel 7. No, sir, I disagree with that. That may have been released later in a FOIA response to Channel 7, but it was not at the time. And there's two reasons I state that. One is that I can't remember if it was Wallace or Brady, but one of them testified that he did not believe that the email in question was in the box that was sent over to Maureen Glisevich on April 30th. So if he's the guy who's, you know, sending the material out and he says it wasn't in the box, it wasn't in the box. The other issue is that Maureen Glisevich testified that she never looked through that entire box and never, ever found that email in that box. Not before Harris gave it to her, not after Harris gave it to her. Then there's a dispute here about whether it went to Channel 7 the first time. Well, I don't think there's a dispute. I think they admitted that it didn't go to Channel 7 the first time. I'm sure Mr. Freeland will try to argue there is a dispute, but I don't think there is one. I think, like I said, it was Wallace or Brady got up and testified on cross-examination that it wasn't in the box that initially went to Channel 7. And they're the ones who did it. So if he testifies that way, he would know. And he surely had no reason to say otherwise. Well, is this argument in your briefing? Yes. I thought this particular argument about republication was based on the assumption that that email went to the TV station two times. It went in response to the FOIA request, which Harris didn't have anything to do with fulfilling that response. And then Harris got it directly to the reporter. Well, that is... Am I misunderstanding what happened? I think that's the defendant's position, that the email went to the Treasurer's Office first in the box of documents produced in response to a FOIA request, and then by Mr. Harris directly to Ms. Glisevich when he handed it to her. But the problem with that is, once again, Ms. Glisevich testified that she never looked through the box and found the email in there, and two, that either Wallace or Brady testified that they did not deliver that in the first... Well, let me move on to another question. Yes, sir. And that may be really irrelevant to really what I want to ask. If the key here, the defamatory document is this email, what difference does it make if the same email went to the TV station twice? Is that even republication? They already had it. It was the same document, right? It's the same email. It's the same document. The TV station didn't learn anything new. It wasn't repeated by somebody. I heard this. Hey, I heard this. Let me repeat it. Repeat what I heard, even though you've already heard it. It was the very same allegedly defamatory communication. It simply went twice. Well, sir, I would have to disagree that it went twice, and I would have to disagree that the TV station didn't learn anything new. The evidence is undisputed that Maureen Glisevich did not see it in that box, that the first time she saw that email was when Jim Harris handed it to her in the red folder. There's no question of that. In any event, I don't think it's ultimately all that important, other than in giving instruction number 13, the judge gave a charge that's not supported by the evidence, so it was error in that fashion. But ultimately, if you republish material with a defamatory statement, you are liable for it as though you were the original publisher. So regardless of whether or not it was in that box, Jim Harris is still liable for it. And the other issue there is that if it had just been an email in a box, it might not have seen the light of day. Jim Harris went to her and said, this is the real story. He said, basically, when he handed it to her, the things that are stated in this are true, which is probably what got it published. I've only got three minutes left, so I'll stand down. Thank you. Very well. Mr. Freeland, good morning. You may proceed. Thank you. I'm Byron Freeland, appearing on behalf of the Appellees. In this case, Treasurer's Office of the State of Arkansas, Jim Harris and Dennis Milligan. I think the court has steered in on some of the primary issues, and it is the position of the defendant that there was a disputed question of fact at the trial, whether or not Channel 7 received the email twice. It was testimony that went over what was in the box or not to Channel 7 prior to Mr. Harris going to Channel 7 to meet with Mrs. Glisevich. And so the judge's instruction, number 13, was it's a disputed question of fact, whether it went over there or not. The judge gave the jury an instruction, you must find that Mrs. Glisevich from Channel 7 possessed the email. So it asked the jury to resolve this question of fact. It says you must find that she possessed the email. And if she possessed the email, then it wouldn't be publication to her. And that gets back to the question we were asking, are there any cases Judge Erickson may have raised, any cases about publication to the same person? We can't find any where it's defamation to publish the same thing to the same person. So there was a question of fact. We argued they had the email two times, the first time when it was delivered in response to the FOI request, the second time when Mr. Harris went over. And so it couldn't be defamation. And the judge properly gave the instruction, found that she possessed it. In fact, we argued, we objected to that instruction also and argued, should say that Mr. Harris believed that she possessed it because that was what he was told when he went over. So we did, I think the instruction was proper. I think one thing to point out also on that is that there's two other claims, invasion of privacy and false light counts that were asserted against the defendants in this case, all of which the defendant ruled against the plaintiff's own. And it doesn't say in those two instructions on invasion of privacy and false light, it says false light or invasion of privacy is gay publicity too. And disclosure of public facts made a public disclosure of fact. Those two instructions don't say that she had to, that it had to be published. The word publish is not used in those other two instructions. So there are three causes of action of defamation, false light, and invasion of privacy. And only defamation said anything about, you know, the possession instruction only affected that one. And the jury ruled against the plaintiffs on both of those instructions, ruled against them on all counts. And so we don't believe that instruction was improper or we believe it affected the outcome of the trial. I'll move on to the first issue they had was the immunity issue on the internal publication of the email. This was an email that was originally written in April of 6th. It was sent to Mr. Brady and there's no proof it was seen by anybody other than Mr. Brady. And the court granted summary judgment to the defendants on that case because of the statutory immunity in Arkansas law. And the question is that it's been raised by the plaintiffs or the appellates in this case is whether or not who had the burden of proving malice. And we maintain that while you have to, it's an affirmative defense to plead immunity, that the plaintiffs have the burden of showing malice. It is an affirmative defense that you plead that there's immunity, but then the plaintiffs have to come back and show malice to defeat that affirmative defense of immunity. And this is in Arkansas State Medical Board versus Byers. That case is a 2017 case we quoted in our brief. And it talks about on pages 464 and 465 that Byers failed to establish malice. This is a termination case involving the state medical board. This is the plaintiff failed to establish malice. This is why the case failed. This is also the plaintiff's bare allegations of malice were insufficient. And that's the most recent pronouncement from the Arkansas Supreme Court that it's an affirmative defense, but the plaintiff has the burden of showing malice. And it only makes sense that you don't have the burden of proving a negative. And you assert that you have immunity, and then you can defeat immunity by proof that you acted with malice. They did not do that. The only thing in the summary judgment stage they used to say there was malice was saying that the allegations in the email or the wording of the email was false. That showed malice. The court found that that was insufficient. And also the jury found that the external publication was not defamatory. It was not false. And so it's hard to go back and say when the jury finds that the external publication was not defamatory, it's hard to argue that the internal publication that was only seen by one person was defamatory. And I think the language of the email shows that the email did deal with a work issue, that how Mr. Singer had not performed his job, they were having continuing problems with him, said he was at a loss to know what to do with him. Were there special interrogatories presented to this jury on the questions that we're discussing at this point? There were no special interrogatories on anything other than malice. And so malice was at the end of each of these jury instructions for defamation, false light, invasion of privacy, and they did not get to that interrogatory. So no one ever asked this jury to make a determination as to whether the statements, in fact, were defamatory on their face, or second, whether or not the statements were truthful. And so at the end of the day, we know that the jury found that there was no defamation, and so it could be based either on the fact that the statements were not defamatory in nature, and that is that they were not intentionally injurious to reputation, or that they were truthful. Right, or it could be they were at the proximate cause. Lack of causation as well, right. Right. No damages, right, the whole bit. Correct. And the reason that's so important in this case is that this is a very unusual fact situation where you have a man who's terminated from the treasurer's office on the way home from being terminated. He calls a newspaper reporter, and the FOI process begins almost immediately. So you have his friends publishing things on the Internet where they did FOI requests, and so there are all kinds of issues about proximate cause floating around there when his own friends were publishing the same email. So, yes. It could be any number. So the defense was and could very easily have been found by the jury to be that he invited the dissemination of this material by his own conduct. That is correct. Very good. It's a very unusual fact situation. And we think that the jury instruction was justified because of the unusual fact situation that Singer contacted Channel 7 before he was ever contacted by the treasurer's office, and that Channel 7 made a Freedom of Information Act request before they were ever contacted by the treasurer's office. And we say that the Freedom of Information Act request was fulfilled or we did comply with it before Mr. Harris went over there, which is a disputed question. In fact, the other things are not disputed. Now, what part of that statement is the disputed question of fact? The disputed question of fact is whether or not it was in the box. I think the testimony is it was either in the box or some other information that they sent over in another file. So the defendants definitely took the position there was testimony to create a disputed question of fact, whether or not the April 6th email was in the initial delivery there before Mr. Harris went over. And I think that's the reason the judge gave the instruction. And do you agree that it's this email is the root of the lawsuit here? There's no question that's true, yes. The whole case is based on the email. And I think the court needs to read it very carefully. And the jury, one of the things they could have found as we were going through with Judge Erickson is that the statements in there were true. Because we maintained they weren't true. So there are all kinds of factors that could have gone into how the jury made that discovery because there were no interrogatories except when they got to malice. They had to answer interrogatory whether or not malice had been proven. Did the reporter testify? Yes, Elisavitch, yes. And what did she say about her knowledge of this email? She did not look through that thing, those emails before she met with Mr. Harris. So she did not know if she had it or not at that point. Was she the one that made the FOIA request? She is. I believe she is. If she didn't, it's a station, but she was the person that was driving it. I mean, they could have some clerical process where it went through, but she was the reporter. That gets me back to this question. Maybe I'm the only one that's looked at this case that has this question. Do we even get to a republication issue when it's the same email? It just goes to the same person twice. It's not two separate emails. They're not emails issued by separate individuals. It's the same email. It's just presumably or perhaps went to the same individual twice. Is that even republication? We take the position it is not, that once she received it the first time and the jury obviously found that she did, that she possessed the email, then it's not republication to give the same email to the same person. And it seems to me that the issue is even more clear than that because what you're really looking at at this point is the statement is delivered by the treasurer's office twice to the same person, and I can't for the life of me find a case that says the second publication is anything at all. It's not like it came from a different source. It could be the same email. One comes from the treasurer's office. One comes from the secretary of state office. One comes from the janitor. Each of those may be actionable, but if it comes from within the treasurer's office and it goes to Channel 7 and it does that twice, how can there be two acts of defamation? Right. That is our position. That is correct. Well, there are a lot of other issues that they have raised. One is they asked for a Freedom of Information Act instruction. We say that was not necessary. The judge made the correct decision there because the defamation instruction covers what you would do with a Freedom of Information Act instruction anyway because to find a defamation, they had to find a false statement. I think that's instruction enough to the jury. Under privacy, false light, you have to show that placed in a false light, it would reasonably offend or aggrieve the person. So we think the instructions as given cover any information that the Freedom of Information Act instruction would have added. In addition, there is no Freedom of Information Act cause of action in Arkansas. On this whistleblower activity, they wanted an instruction on whistleblower and the right to question the witnesses on whistleblowing activities. When the judge ruled against that, there was never any proffer of what the testimony would be. So the court is left with guessing what testimony there would be there and we don't have that. I don't think that's a fair place to put the court and I think the court can't rule when they did not properly proffer that testimony. There's an issue about the Rehabilitation Act and the ADA. The ADA case went to the jury and the defendants prevailed on that count and the argument is that they should have gotten the Rehabilitation Act count also but the elements of both counts are the same. Well, there's discrimination because there's a perception of disability. So we think that question was answered by the jury either way. And we think the court was correct in stating that there was no basis to give the Rehabilitation Act claim in this case because there's no proof that they received federal aid. They were the banker for the state. There was another jury instruction that they offered about the Catspaw Theory. We think that the court made the proper decision on that issue also. The Catspaw Theory did not fit the facts in this case. Treasurer Milligan testified that he made the decision based on what he heard from all the executive team, which is four members, not just Jim Harris. He was aware of the e-mail, but he had information. In fact, the e-mail recites all the problems. The testimony at the trial has all these problems that Mr. Harris had. The treasurer was aware of. And, of course, there was the final straw incident where Mr. Singer was sent out to go to a meeting and they sent someone out to the meeting to find if Mr. Singer was there because they'd gotten a complaint about his conduct, that he'd been rude to a lady named Joy Ballard, who was an official in Sling County and a friend of the treasurer's. Went out there and couldn't even find Mr. Singer at the meeting, and he was terminated right after that. So we think the Catspaw Instruction did not fit the circumstances in this case. I'm down to 16 seconds, and hopefully there are so many points of appeal here that we could cover, but I think I've answered the questions that the court's asked and what was brought up in the earlier argument. So with that, I'm down to three seconds, two seconds, so I'll sit down. Thank you. You're welcome. Your Honor, first of all, Wallace testified that the 4-6-15 email was not in the documents provided to Glisevich on April 30th, 2015. 2015, it was not provided until May 1st. That's at trial transcript 590 and 591, 601 through 603. In addition, 577 says, each of several communications to a third party by the same defamer is a separate cause of action. Third, if you look at the Dun & Bradstreet case, I think that was a credit, some sort of business reporting agency, so presumably they were reporting to their subscribers the same kind of information repeatedly. Walmart v. Lee involved multiple publications, although to different persons. And as far as what happened with the dissemination within the office, that email was not disseminated just to Jason Brady. It was disseminated to the treasurer, Dennis Milligan. He testified to it. Harris testified to it. Dennis Milligan was the decision-maker who fired my client. He indicated that mental health issues were part of what led to my client's termination, and you have false allegations of mental health issues in there. So there was dissemination of this email beyond Jason Brady, and it was to a person who was pretty important for purposes of this case since he's the one who terminated my client. Do you dispute that he abandoned his post on the last day in question? Yes, that was disputed. That was disputed. Didn't the jury ultimately decide all these questions of fact? Now, on the questions of fact, the issue for appeal on the ADA claim was that I had submitted an agency instruction combined with a proximate causation instruction based on Staub v. Proctor because there was some evidence that Milligan did not regard my client as having a mental health issue while Jim Harris did, and Jim Harris is the one who made the recommendation to Milligan. Jim Harris is the one who had knowledge about Singer's performance. Dennis Milligan said he did not have knowledge about Singer's performance, didn't do any independent investigation. So that's pretty much a perfect example of a Staub v. Proctor type situation, and we submitted an agency instruction and a Staub v. Proctor instruction which was denied. So, you know, yes, the jury would have made fact findings, but they were also not properly instructed. Now, the other thing is that this J.C. Carlisle case indicated that where you have a general verdict versus interrogatories, if you have misleading instructions, it's reversible error either way. Either way, under J.C. Carlisle, misleading jury instructions, which we had in instruction number 13, are reversible error. Thank you. Thank you. The case is submitted. We'll take our break now.